C. E. LIGHTNER AND R. H. LIGHTNER v. CITY OF RALEIGH, A MUNICIPAL CORPORATION; GEORGE A. ISELEY, MAYOR AND COMMISSIONER OF FINANCE; C. C. PAGE, COMMISSIONER OF PUBLIC WORKS; AND CARL L. WILLIAMSON, COMMISSIONER OF PUBLIC SAFETY, CONSTITUTING THE BOARD OF COMMISSIONERS AND GOVERNING BODY OF THE CITY OF RALEIGH.

(Filed 2 May, 1934.)

**1. Municipal Corporation E d: Easements A e—**

A municipal corporation can acquire no easement in lands by the continual discharge of raw sewage in a stream running through the lands when such acts constitute a public nuisance.

**2. Limitation of Actions B a—Damages for trespass to land from sewer system prior to three years from institution of action are barred.**

Where a municipal corporation constructs a sewer system which empties quantities of raw sewage and other obnoxious matter in a stream, which matter is periodically washed upon contiguous lands by freshets, in an action against the city by the owner of the land, all damages to the land based on trespass occurring prior to three years before the institution of the action are barred by the three-year statute of limitation, N. C. Code, 405, 441(3), and an instruction to the jury to this effect is not erroneous.

**3. Same—Where trespass to land by sewer system is continuing and has existed for more than three years plaintiff may recover only increased damage resulting since three years prior to institution of action.**

Where plaintiff brings action against a city to recover damages resulting to plaintiff's lands from the city's sewer system, alleging that the city discharged raw sewage and other obnoxious matter into a stream running by plaintiff's land and that such matter was periodically washed upon plaintiff's land by freshets, greatly damaging the land and rendering it impossible of use or habitation, and demands the recovery of permanent damage for such wrongful taking, the trespass is a continuing one, and where the first acts of trespass are barred by the three-year statute of limitation, N. C. Code, 441(3), an instruction that plaintiff could recover only the difference in the value of the land before and after the three-year period prior to the institution of the action is not erroneous, and where the jury finds that there was no increase in the damage to the land subsequent to three years prior to the institution of the action, a verdict that plaintiff recover nothing will be upheld on appeal.

**4. Trial E e: Municipal Corporations E d—**

Where plaintiff, in an action to recover damages to lands from a municipal sewer system, desires more specific and detailed instructions on the issue of permanent damage he should present prayers for special instructions.

**5. Trial F a—**

Where the issues submitted arise upon the pleadings and are determinative of the facts in dispute they will not be held for error on appeal.

**6. Appeal and Error A a—**

On appeal in a civil action the Supreme Court is limited to matters of law or legal inference. Art. IV, sec. 8.

APPEAL by plaintiffs from *Grady, J.,* and a jury, at January Term, 1934, of WAKE. No error.

The plaintiffs, C. E. Lightner and R. H. Lightner, instituted suit 13 February, 1932, against the city of Raleigh for recovery of permanent damages to plaintiffs' lands by reason of the city of Raleigh emptying its raw sewage into Walnut Creek adjacent to plaintiffs' lands. The facts substantially, are as follows: Walnut Creek is the natural drainage for all that portion of the city south of Hillsboro Street and New Bern Avenue including the various State institutions west of said city. The Holleman Road, State Highway No. 10, where the same crosses this creek, about half a mile south of the present city limits, is the western boundary of plaintiffs' land and Walnut Creek for almost a mile is the northern boundary of plaintiffs' land. The city of Raleigh, under chapter 207, Private Laws of 1889, was authorized to establish a system of sewerage. The early part of 1890, the city established the Walnut Creek system. This system had two outfalls into Walnut Creek. One of these was about 300 yards below the pumping station, which pumps the city water supply from Walnut Creek, and west of the said highway No. 10. This was known as the southwestern outfall. Another outfall into said creek was east of the intersection of said highway and Walnut Creek. In 1910, the city built an impounding reservoir on Walnut Creek above the reservoir at the pumping station and in 1923, another impounding reservoir called Lake Johnson was built still further up Walnut Creek. The waterworks and sewer system were extended, revised and the outfall in Walnut Creek enlarged in 1923. Many new sewer connections were made between 1918 and 1923 and in the latter year the outfall just east of the intersection of said highway and Walnut Creek, then a 12-inch main, was found too small and the main divided and a larger additional outfall constructed emptying into the creek further east also opposite plaintiffs' lands. The sewer lines from State College, penitentiary, State Hospital and blind institutions have been connected to these sewer lines in 1922 and 1923. In 1917, the plaintiffs bought at a land sale a 94-acre tract on Walnut Creek and in February, 1926, purchased 60.8 acres lying between the first tract and the highway No. 10, making about 155 acres of contiguous land, all part of the same original tract, and bounded by said highway on the west and Walnut Creek on the north. At the time of plaintiffs' first purchase, 1917, the city had one main emptying raw sewage into Walnut Creek at a point

just east of the intersection of the highway, Route 10, and Walnut Creek. This main has been continuously used by the city for said purpose.

When plaintiffs bought the first tract in 1917, one sewer main then emptied into Walnut Creek just east of the highway and just above this tract, but the sewage was not then noticeable and did not interfere with the use of said land. Plaintiffs were in business as undertakers, had 12 head of horses and bought the tract largely on account of the good meadow. They farmed it from 1917 to 1926, cut hay in the meadow, hauled sand from the creek and sold it to the city. The place had one house on it and plaintiffs built another four-room house, a couple of tobacco barns and a packhouse. About 1926, as automobiles had displaced horses in plaintiffs' business and the plaintiffs bought the additional 60.8 acres adjacent on west to said 94 acres and converted the whole 155-acre plantation into a dairy. For this purpose plaintiffs erected a building, built a silo and concrete dam on a stream tributary to Walnut Creek at a total cost of between $3,500 and $4,000. That at the time of this installation, about 1926-27, the sewage condition in the creek was not noticeably bad, but soon thereafter the water slackened off in the creek, it became very sluggish, principally all the water that was flowing would be coming out of the sewer pipes and excrement, toilet paper and whatever goes through a sewer would bank up in the stream all through the dry season, the filth about waist deep, then when rain or flood came, it would lift up this stuff and spread it out all over the meadow, leaving excrement, etc., on the land when water receded; that as this condition developed and grew worse, plaintiffs abandoned the pasture; that bacteria count in the milk became so high that plaintiffs fenced off the meadow to keep the cows out and subsequently had no land with grass on it and had to feed the cows almost entirely to run the dairy. That when plaintiffs acquired either of said tracts there was no artificial bank on the north side of the creek opposite plaintiffs' lands and the water coming under the bridge, highway No. 10, went largely over on the left side of the creek opposite plaintiffs' lands, but some time after plaintiffs bought the last tract the city trash wagons began to haul stuff and dump it on the north bank of the creek; this dumping was continued until a dike, was thereby built on the north bank of the creek wide enough for these trucks to run down and back until this dike extended down the creek from the bridge possibly 200 yards and as high above the creek as a man. The effect of this dike, which has been built up since 1927 and added to, was when the water in time of freshet shot under the bridge instead of going down on the left-hand side of the creek, threw every bit of it on plaintiffs' property, going over the whole of the meadow in time

of freshet. Thus water, sand and sewage from the creek went over plaintiffs' property, into the fresh streams, which crossed plaintiffs' lands, dammed them and caused the swamp to spread out on the other farm land of the plaintiffs and damaged that. That in the latter part of 1929, the condition having grown steadily worse, plaintiffs finally abandoned the dairy; that the stench created by the sewage became so bad that people could not live in the homes on the place, and since that condition existed the place has been rendered practically worthless; that some people have occupied the houses just to keep them from being burned; that since 1929, the place has become practically worthless and plaintiffs testified that in their opinion the damage amounted to between $18,000 and $20,000.

The defendants denied that plaintiffs had the right to recover and set up the following defenses: "VI. That defendant has dumped its sewage into said Walnut Creek, and that the overflow of said Walnut Creek has been the same for more than forty years; that defendant has acquired a prescriptive right to use said Walnut Creek and the lands within its overflow boundaries, by such use; and that defendant without waiving its right hereunder, specifically pleads said adverse use of said creek for nearly forty years, and for more than twenty years, in bar of plaintiffs' right to recover hereunder. VII. That if the plaintiffs have any claim or right of action against the defendant by reason of the matters and things alleged in the complaint, which is again expressly denied, that such claim or right of action matured more than two years prior to 9 November, 1931, the date on which the plaintiff presented his said alleged claim to the board of commissioners of the city of Raleigh, and such claim is accordingly forever barred by the provisions of section 442 of the Consolidated Statutes of North Carolina, and said section is expressly pleaded in bar of any recovery by the plaintiffs herein. VIII. That if the plaintiffs have any claim or cause of action on account of the matters and things alleged in the complaint, which is again expressly denied, that such claim or right of action, and the happening and infliction of the alleged injury to the property of the plaintiffs therein complained of, occurred more than ninety days prior to 9 November, 1931, the date of the filing by the plaintiffs of their alleged claim with the commissioners of the city of Raleigh, and the plaintiffs' right of action is accordingly barred by reason of the provisions of section 2, of Article XXII of the charter of the city of Raleigh (N. C. Private Laws of 1913, chapters 59 and 60, and acts amendatory thereof), which said section is expressly pleaded in bar of recovery of the plaintiffs. IX. That if the plaintiffs have any cause of action by reason of the matters and things alleged in the complaint, which is again expressly denied, that such cause of action accrued more

than three years next preceding the commencement of this action, and the said three-year statute of limitation is hereby expressly pleaded in bar of any recovery herein. X. That if the plaintiffs have any cause of action by reason of the matters and things alleged in the complaint, which is again expressly denied, that such cause of action accrued more than ten years next preceding the commencement of this action, and the said ten-year statute of limitation is hereby expressly pleaded in bar of any recovery herein."

The following issues were submitted to the jury and their answers thereto:

"1. Are the plaintiffs the owners of the lands described in the complaint? Answer: Yes (by consent).

2. Has the sewerage system, with mains emptying into Walnut Creek, been operated by the defendant openly, notoriously, uninterruptedly and adversely, and at all times substantially in the same condition, for more than twenty years next before the commencement of this action as alleged by the defendant? Answer: No.

3. Have the lands of the plaintiff been damaged by the maintenance and operation of said sewerage system as alleged in the complaint? Answer: No. Not since 13 February, 1929.

4. Is the plaintiffs' cause of action barred by the three-year statute of limitation as alleged in the answer? Answer: Yes, for all damages occurring prior to 13 February, 1929. (Answered by the court.)

5. What damages, if anything, are the plaintiffs entitled to recover of the defendant by reason of the operation and maintenance of said sewerage system? Answer: None."

The plaintiffs tendered the following issues: "(1) Are plaintiffs the owners of the land described in the complaint? (2) Has plaintiffs' land been damaged by the installation and maintenance of the defendants' sewer system as alleged in the complaint? (3) If so, what permanent damages are plaintiffs entitled to recover?" The court declined to submit the above issues; exception and assignment of error by plaintiffs. The court formulated the five issues above set forth and the plaintiffs in apt time objected and excepted and assigned error.

The exceptions and assignments of error made by plaintiffs and necessary facts will be set forth in the opinion.

*Murray Allen and Briggs & West for plaintiffs.*
*J. M. Broughton and Charles U. Harris for defendants.*

CLARKSON, J. The controversy succinctly is to the effect: (1) That defendant is emptying its sewage into Walnut Creek and started doing so early in 1890. (2) In 1910, the city built an impounding reservoir on

Walnut Creek above the reservoir at the pumping station, and in 1923 another impounding reservoir called Lake Johnson was built still further up Walnut Creek, and extracted the natural flow of water from Walnut Creek and turned it back in filth, through the sewer system. (3) The waterworks and sewer system were extended, revised and the outfall in Walnut Creek enlarged in 1922-23. (4) John Bray, who was commissioner of Public Works for the city of Raleigh for four years, the last year, 1923, a witness for the plaintiffs, testified, in part: "Of course, there were a great many houses built in the eastern, as well as over all the city as far as that goes, and that increased the capacity of the sewage. All of the State institutions having increased their numbers, including State College, which in 1911 was about nearly five hundred, and in 1929 about nine hundred and now about eleven hundred. And the penitentiary and the asylum, the blind institution have come in since then, all connected to sewer lines emptying into Walnut Creek. I couldn't tell you as of the year of 1929, how much the natural flow of the water in the creek had been diminished by these various changes, building and other things, but I think the sewage, increase capacity on the sewage, would be around thirty per cent. I might say between 1917 and 1929. Most of the increases in houses and population in the institutions took place in 1919 and 1929. The third sewer line above Lightner's land was put in in 1923. These institutions came in the sewer system about five years prior to that time."

(5) B. L. Crocker, a witness for defendant, who has been in the real estate business in Raleigh 20-odd years, testified, in part: "I have a fair knowledge of the general occupancy of property in the southeast section of the city. I should think four or five hundred houses have been vacant in the last four or five or six years. Even today there are many vacant houses. At one time, a lot of Negroes worked for R. G. Lassiter and those houses were built out there and they occupied them. Since then, the Negroes have gone elsewhere seeking employment. This condition of vacancy which I have described existed in that section of the city." (6) J. A. Whitman, director of the Utilities Division Department of Public Works, witness for defendant, and connected with the city in an engineering capacity since 1923, testified, in part: "In Raleigh, our per capita consumption of water from the filter plant runs about fifty-seven gallons; infiltration amounts to another ten gallons, with a total of sixty-seven gallons per capita at the present time. What I meant by my reference as to gallon for gallon was that you will eventually deposit the same amount into the sewer system as you consume. That is the experience generally from a long calculation. I have the record of the volume for 1926. The actual amount will daily average four and seven-tenths million gallons. In 1929, it averaged

about three million per day, that is, there was more than a million gallons less per day in 1929 than there was in 1926. The records indicate that the actual dumpage into Walnut Creek was less in 1929 than it was in 1926. There has been a gradual decrease ever since 1926, up to the present time." (7) It was in evidence and contended by defendant: "That at the time that plaintiff purchased the premises alleged to have been damaged, the sewage from the entire southern portion of the city of Raleigh was being dumped into said creek and the plaintiffs were and should have been advertent to that fact; that they knew of the construction or extension of the additional sewer line running east and west and made no objection thereto. That prior to the time the plaintiffs purchased said tract of land, former owners operated farms thereon and this is the first and only time any owners thereof have complained or alleged that said land was damaged or affected by the discharge of the said sewer into said creek."

Chapter 207, Private Laws of 1889, "An act to amend the charter of the city of Raleigh, North Carolina," section 3, subsection 1, in part is as follows: "They may also construct or contract for the construction of a system of sewerage for the city, and protect and regulate the same by adequate ordinances; and if it shall be necessary, in obtaining proper outlets for the said system, to extend the same beyond the corporate limits of the city, then in such case the board of aldermen shall have the power to so extend it, and both within and without the corporate limits to condemn land for the purposes of right of way, or other requirements of the system, the proceedings for such condemnation to be the same as those prescribed in chapter forty-nine, volume one of The Code." Similar power is given in chapter 59, Private Laws of 1913, "An act to incorporate the city of Raleigh and to repeal its present charter and all laws in conflict with this act."

The defendant set up the defense of an easement. In 20 R. C. L., sec. 114, p. 498, in part, it is said: "The rule is universally recognized that prescription or lapse of time cannot be relied on to establish a right to maintain a public nuisance." Part section 115, p. 499: "In the case of nuisances that are purely private in character, prescription is generally recognized as a good defense."

In regard to the question of easement, the court below, on the second issue submitted to the jury, correctly charged them: "In respect to this issue, however, gentlemen, and after considering the decisions of the Supreme Court applicable to the cases of this kind, I am of the opinion that issue will have to be answered in favor of the plaintiffs. I, therefore, direct you, gentlemen, that if you find the facts to be as testified by all of the witnesses, to answer the second issue 'No.'"

In *Cook v. Mebane,* 191 N. C., 1 (6): "The court's definition is the one generally accepted. 29 Cyc., L. & P., p. 1152: 'The term "nuisance" means literally annoyance; anything which works hurt, inconvenience, or damage, or which essentially interferes with the enjoyment of life or property.'" *Hodgin v. Liberty,* 201 N. C., 658 (660-1); *Holton v. Oil Co.,* 201 N. C., 744 (747). In *Cook v. Mebane, supra,* at pp. 4-5, is the following: "As to polluting water, it was said in *Finger v. Spinning Co.,* 190 N. C., p. 78: 'The fact that this may call for the expenditure of large sums of money by defendants cannot be considered as justifying the continuance of a trespass upon or a nuisance to the lands of plaintiff by defendants. As said by *Chief Justice Clark,* in *Rhyne v. Mfg. Co., supra,* 182 N. C., 489: "Defendants must attain its ends, advance its interests, or serve its convenience by some method, whether in improving its sewerage system or otherwise, which shall be in accordance with the age-old maxim that a man must use his own property in such a way as not to injure the rights of others, *sic utere tuo, ut alienum non lœdas.*" ' "

"*Hoke, J.,* in *Donnell v. Greensboro,* 164 N. C., 334, speaking to the subject of sewage disposal, says: 'The decisions of this State are in approval of the principle that the owner can recover such damage for a wrong of this character, and that the right is not affected by the fact that the acts complained of were done in the exercise of governmental functions or by express municipal or legislative authority, the position being that the damage arising from the impaired value of the property is to be considered and dealt with to that extent as a "taking or appropriation," and brings the claim within the constitutional principle that a man's property may not be taken from him for the public benefit except upon compensation duly made.'" Citing numerous authorities.

Chapter 59, *supra,* Art. XXII, sections 1 and 2, requires certain notice to defendant city, which seems to have been done in accordance with the statutes, C. S., 442. *Peacock v. Greensboro,* 196 N. C., 412.

The contention of the defendants: "Is the action barred by the three-year statute of limitations? Sec. 405, N. C. Code, 1931 (Michie): 'Civil actions can only be commenced within the periods prescribed in this chapter, after the cause of action has accrued; except where in special cases a different limitation is prescribed by statute. The objection that the action was not commenced within the time limited can only be taken by answer.' Sec. 441, subsec. 3: 'For trespass upon real property. When the trespass is a continuing one, the action shall be commenced within three years from the original trespass, and not thereafter.' The question arises—What constitutes a continuing trespass, and what the original trespass?"

The principle is set forth in 37 C. J., "Limitations of Actions," part sec. 249, pp. 883-4: "Cases frequently arise where damages resulting from an act are continuing or recurring so that they cannot presently be ascertained or estimated so as to be presently recoverable in a single action. In such cases separate and successive actions may be brought to recover the damages as they accrue, and a judgment rendered in one of such actions for damages accrued up to the time when suit was brought is no bar to another action to recover damages accruing after the judgment. To cases of this character, the statute of limitations does not have the same rigid application as to cases where all the damages may be recovered in a single action, and the two main principles applying are as follows: Where continuing or recurring injury results from a wrongful act or from a condition wrongfully created and maintained, such as a continuing nuisance or trespass, there is not only a cause of action for the original wrong, arising when the wrong is committed, but separate and successive causes of action for the consequential damages arise as and when such damages are from time to time sustained; and therefore so long as the cause of the injury exists and the damages continue to occur plaintiff is not barred of a recovery for such damages as have accrued within the statutory period beyond the action, although a cause of action based solely on the original wrong may be barred, and this has been termed the general rule, to which the rule, where the injury is permanent, is an exception." *Perry v. R. R.,* 171 N. C., 38; *Teeter v. Telegraph Co.,* 172 N. C., 783; *Morrow v. Florence Mills,* 181 N. C., 423; *Anderson v. Waynesville,* 203 N. C., 37; *Gray v. High Point,* 203 N. C., 756.

In *Langley v. Hosiery Mills,* 194 N. C., 644 (646), is the following: "In a later case against the same defendant (*Webb v. Chemical Co.,* 170 N. C., 662), the plaintiff appealed, assigning for error the judge's refusal to submit an issue for permanent damages, and it was held that the case was not one of those in which, at the election of the plaintiff, such an issue must be submitted, *Hoke, J.,* remarking: 'In some cases on this subject, it has been held that, when one erects a substantial building or other structure of a permanent character on his own land which wrongfully invades the rights of an adjoining proprietor by the creation of a nuisance or trespass, the injured party may "accept or ratify the feature of permanency and sue at once for the entire damage." *Chicago Forge and Bolt Co. v. Sanche et al.,* 35 Ill. Ap., 174. But in cases strictly of private ownership, the weight of authority seems to be that separate actions must be brought for the continuing or recurrent wrong, and plaintiff can only recover damages to the time of action commenced. In this State, however, to the time of trial.'" Citing numerous authorities. "In cases of private ownership, an issue

for permanent damages may be submitted by consent of the parties. *Morrow v. Mills,* 181 N. C., 423." *Wharton v. Mfg. Co.,* 196 N. C., 719.

In the instant case, the plaintiffs elected to pray for permanent damages, which they had the right to do as the property was attempted to be taken by defendants for a public purpose. *Rhodes v. Durham,* 165 N. C., 679 (680). The court below charged the jury as follows: "Is the plaintiffs' cause of action barred by the three-year statute of limitation, as alleged in the answer? Gentlemen, it is my view of the law, and you, gentlemen, of course, will take the law from me—and if I am wrong, I can be overruled by the Supreme Court— but as I view the law of this case, the damages which the plaintiffs would be entitled to recover, if any, would be limited to what has occurred within the last three years prior to the beginning of this suit. In other words, gentlemen, they cannot maintain an action for damages against the city of Raleigh for any depreciation in the value of their lands due to any act upon the part of the city prior to three years before 13 February, 1932, which would be 13 February, 1929. This action was brought on 13 February, 1932, and the defendant having pleaded the statute of limitation, it is my duty to say to you, as I conceive the law to be, that the plaintiffs cannot recover any damages for anything that happened prior to 13 February, 1929. Therefore, gentlemen, I have answered this issue myself, or at least, I direct you to answer it. If you find the facts to be as testified to by all the witnesses you will answer that issue 'Yes,' for all damages accruing prior to 13 February, 1929.' "

We see no error, from the authorities cited, to this part of the charge to which plaintiffs except and assign error. The court below charged the jury as follows: "We now come to the last issue, or the fifth issue: What damages, if anything, are the plaintiffs entitled to recover of the defendant by reason of the operation and maintenance of said sewerage system? Now, gentlemen of the jury, let me impress this upon you.

It is the law, as I understand it, and for the purpose of this action, it is the law, that if you allow the plaintiffs any damages in this case it will only be such damages as were inflicted upon the lands since 13 February, 1929, up to the beginning of this action. That is, permanent damages. . . . The burden of this issue is upon the plaintiffs. They argue to you that they have been damaged during the years 1930, 1931, 1932, and 1933; that there has been an additional burden cast upon the lands by reason of the overflow of sewage during that period and that you ought, in good conscience, to allow them damages for the depreciation in the value of the land due to this additional burden. These are all questions to be resolved by you, gentlemen, and so, in

conclusion, remembering that the measure of damages is the difference in value between the lands prior to 13 February, 1929, and after the acts of trespass complained of on the part of the city. That is, gentlemen, you will estimate what was the fair market value of these lands prior to any act of trespass on the part of the city during the past three years. You will then estimate what the lands were worth after the acts complained of during the past three years prior to the institution of this action. You will deduct the latter figure from the former and the difference between the two would be your answer to this issue."

We think this charge substantially, the same as we approved in *Wagner v. Conover,* 200 N. C., 82 (85) : "Permanent damage means whatever injury has been done to the place and will be done—that is, damages to its value. In other words, how much, if any, had this sewer system there damaged the place, and the way to get at the amount of damage, if you reach that is this: You will ascertain what the place would be worth if the sewer system was not there, and no pollution of the water by the defendant. Set that down in figures. Then ascertain what would be the market value of the land in its present condition— and set that down, and if that is less than the amount if the sewage were not there, then subtract the one from the other, and that would be your answer to the third issue, if you reach that issue." The court charged that it must be permanent damage—but did not define same as in the *Wagner case, supra.*

If plaintiffs wanted the charge more specific or in detail, on the different phases of the controversy and as to permanent damage, they should have presented prayers for instruction. We see no error in the issues submitted. They arose on the pleading and are determinative of the facts in dispute. It may have been better to have submitted an issue as to permanent damages, but the charge covered same. We can only consider here matters of law or legal inference. Art. IV, sec. 8, Constitution of North Carolina, in part: "Jurisdiction to review, upon appeal, any decision of the courts below, upon any matter of law or legal inference."

The jurors are the triers of the facts, if on the record we differ, in their findings, we have no power to correct them. The brief of plaintiffs setting forth the wrong done them, however sympathetic we may be, was for the jury to consider, and not us. For the reasons given, we find in the judgment,

No error.